OPINION
{¶ 1} Defendants-Appellants Fronk's Service Center, Inc. et al. ("Appellants") appeal from the August 8, 2007 Judgment Entry of the Court of Common Pleas of Hancock County, Ohio awarding Plaintiff-Appellee The Commercial Savings Bank ("CSB") judgment against Fronk's Service Center, Inc., Stephen A. Fronk, President, and Stephen A. Fronk, individually.
 {¶ 2} This matter involves the foreclosure of a real estate mortgage held by CSB and a determination of whether CSB acted in a commercially reasonable manner in its disposition of Appellants' secured property. On or about February 10, 2003 Fronk's Service Center and Stephen Fronk ("Stephen") executed a note to CSB in the amount of $150,000. This note was secured by a mortgage on property owned by Stephen and Tammie Fronk, located at 1324 South West Street in Findlay, Ohio, and by assets used at Fronk's Service Center (a Marathon Oil service station and convenience store also located in Findlay, Ohio). On or about April 7, 2003 Fronk's Service Center and Stephen also executed and delivered a note to CSB in the principal amount of $5,000. *Page 3 
 {¶ 3} On August 19, 2004 Stephen ceased operations of Fronk's Service Center. On this same date, CSB took possession of the inventory and moveable assets at the Service Center as these assets were collateral for CSB's loan to Appellants. The assets consisted of a carwash and related equipment affixed to the Service Center, mechanical automotive equipment, inventory of perishable items in the Service Center, and other equipment. CSB subsequently disposed of the Service Center's inventory and assets and applied all of the proceeds to Appellants' outstanding debt to CSB.
 {¶ 4} On April 18, 2005 CSB filed a complaint in the Hancock County Court of Common Pleas for monies due and owing on the promissory notes and for foreclosure of the real estate mortgage.[1] On January 12, 2006 CSB filed a motion for summary judgment. On March 21, 2006 the trial court granted summary judgment in favor of CSB on the issue of foreclosure and set this matter for an evidentiary hearing.
 {¶ 5} On May 17, 2006 the trial court conducted an evidentiary hearing to determine the amount of any monetary judgment to be granted to CSB resulting from CSB's seizure and sale of collateral pledged by Appellants. At the evidentiary hearing, the parties stipulated that $77,846.15 (with per diem interest *Page 4 
accruing in the amount of $12.99 per day) was due on CSB's mortgage as of October 7, 2005. This amount was after the sale of the Service Center's assets and did not include the sale of the South West Street Property.
 {¶ 6} On July 10, 2007 the trial court issued a Decision and Order wherein the trial court determined that CSB sufficiently established that it disposed of the Service Center's assets in a commercially reasonable manner and further ordered that CSB's deficiency judgment should be reduced by the sum of $4,200 which represented the value of a Ruby cash register from the Service Center which had been misplaced.
 {¶ 7} On August 8, 2007 the trial court filed a Judgment Entry granting judgment in favor of CSB and against Appellants Fronk's Service Center, Inc., Stephen Fronk, President, and Stephen Fronk, individually, in the amount of $69,242.28 together with interest and costs.
 {¶ 8} Appellants now appeal, asserting five assignments of error. ASSIGNMENT OF ERROR NO. 1 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN RULING THAT O.R.C. CHAPTER 1309 "DOES NOT EXPLICITLY DEAL WITH THE REPERCUSSIONS OF FAILING TO PROVIDE NOTICE OF DISPOSITION TO A DEBTOR." (TRIAL COURT DECISION P. 6).
 ASSIGNMENT OF ERROR NO. 2 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ADMITTING, OVER OBJECTION, AND RELYING ON HEARSAY EVIDENCE TO ESTABLISH THAT CSB *Page 5 OBTAINED FAIR MARKET VALUE IN ITS DISPOSITION OF THE STATION'S CARWASH. (TR. P. 24).
 ASSIGNMENT OF ERROR NO. 3 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN RULING THAT SINCE APPELLANT'S INVENTORY CONTAINED PERISHABLE ITEMS, CSB WAS NOT REQUIRED TO GIVE NOTICE CONCERNING THEIR SALE AND CONSEQUENTLY THE COURT WAS NOT REQUIRED TO RULE ON THE REASONABLENESS OF THE SALE (TRIAL COURT DECISION P. 7).
 ASSIGNMENT OF ERROR NO. 4 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN RULING THAT CSB'S DISPOSITION OF THE STATION'S ASSETS WAS COMMERCIALLY REASONABLE.
 ASSIGNMENT OF ERROR NO. 5 THE TRIAL COURT'S DECISION AND JUDGMENT ARE CONTRARY TO LAW AND UNSUPPORTED BY AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 9} For ease of discussion, we elect to address Appellants' assignments of error out of order.
 Assignment of Error No. 4 {¶ 10} In their fourth assignment of error, Appellants allege that the trial court erred in determining that CSB's disposition of the Service Center's assets was commercially reasonable.
 {¶ 11} Every aspect of the sale or disposition of the collateral must be reviewed. Estate of Gammell v. Modern Finance Co. (Sept. 3, 1998), 3rd Dist. No. 8-97-37, unreported citing Huntington Natl.Bank v. Elkins (1990), *Page 6 53 Ohio St.3d 79, 559 N.E.2d 456, syllabus. The focus of determining whether the disposition of collateral is commercially reasonable is on the procedure used in disposing of the collateral. Id. citing Elkins, 53 Ohio St.3d 79
at 81. The burden is on the secured party to establish that the sale of the collateral was commercially reasonable. Id. citing Huntington Bankv. Freeman (1989), 53 Ohio App.3d 127, 129-130, 560 N.E.2d 251.
 {¶ 12} R.C. 1309.610 governs the disposition of collateral after default and provides, in relevant part, as follows:
 (A) After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.
 (B) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, at any time and place, and on any terms.
 {¶ 13} In determining whether conduct is commercially reasonable we must look to R.C. 1309.627[2] which provides, in relevant part, as follows:
 (A) The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, *Page 7 disposition, or acceptance was made in a commercially reasonable manner.
 (B) A disposition of collateral is made in a commercially reasonable manner if the disposition is made:
 (1) In the usual manner on any recognized market;
 (2) At the price current in any recognized market at the time of the disposition; or
 (3) Otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.
 {¶ 14} We note that it is undisputed on appeal and also note that the trial court determined in its July 10, 2007 Order that the Service Center's assets were "specialized in nature." Therefore, we shall focus our review of Appellants' fourth assignment of error as related to R.C. 1309.627(B)(3).
 {¶ 15} Our review of the record reveals that Debra Rashleigh ("Rashleigh") of CSB's credit adjustment department testified that in August of 2004 she was given the task of recovering the inventory and equipment that CSB held as security as well as selling that equipment. Rashleigh testified that Stephen Fronk was helpful in the beginning of this process and that Fronk specifically provided her with references "as far as distributors that may be willing to take" or buy the collateral. However, Rashleigh testified that she did not contact any other Marathon Oil dealers about the collateral, nor did she contact any auctioneers about the feasibility of selling the collateral or the car wash at public auction. *Page 8 
 {¶ 16} Appellants presented the testimony of two witnesses who testified regarding the typical practices that occur when a Marathon service station or convenience store is closed. Appellants presented the testimony of Michael Watson ("Watson"), a former marketing representative and current territory manager for Marathon Petroleum Company. Watson testified that he has had opportunities to become familiar with the purchase and sale of dealer equipment and that he specifically "puts the word out to people" who he thinks might be interested in an item. Watson testified that he could not recall if anyone from CSB asked him for assistance in this regard as related to Fronk's Service Center.
 {¶ 17} Watson also testified that part of his job responsibilities included supervising the changing of ownership of Marathon gas stations and convenience stores and that he was directly involved with supervising the shutdown of Fronk's Service Center in August, 2004. Watson specifically testified that he had encounters with CSB representatives as related to the shutdown of Fronk's store. Watson testified that prior to meeting with Dan Kendrick ("Kendrick"), a representative of CSB who advised him that CSB had title to everything at the Service Center, Watson's intention was to purchase all of the items in the convenience store at cost,[3] but that Kendrick's demeanor was adversarial. *Page 9 
 {¶ 18} Watson testified that he had an opportunity to examine the store's perishable items and found "nothing of any significance that [was] out of date at that point in time" and that at that time, the items, including the cigarettes, were readily resalable. Watson also testified that, in his opinion, the resale value of the cash register was between $3,500 and $4,500 and that the value of Fronk's computer was between $200 and $500. However, Watson admitted that he did not know whether the $3,500 value that CSB ultimately received for the items in the Service Center was a reasonable amount, nor did he know the exact value of the car wash or the car wash equipment.
 {¶ 19} Additionally, Appellants presented the testimony of Paul Hinshaw ("Hinshaw"), an owner of a Marathon Oil service station and convenience store in Findlay, Ohio. Hinshaw testified that his store was similar to the store previously operated by Fronk and that his business contained similar or identical items to those used by Fronk, except for the car wash. Hinshaw testified that Fronk's equipment was being used and was in working condition up until the day the store was closed. Hinshaw testified that after he heard Fronk's station was closed, he called CSB on multiple occasions to inquire about the Ruby cash register because he wanted to purchase it for his own service station. However, Hinshaw testified that no one from CSB returned his calls regarding the cash register or his interest *Page 10 
in other items from Fronk's store. Hinshaw also testified that a Ruby cash register typically retails new for over $12,000.
 {¶ 20} Stephen Fronk also testified regarding his contact with CSB regarding the status of his service station and loan. Fronk testified that he called CSB (specifically Dan Kendrick) several times to inquire what he could do to help, but that he received no response from CSB. Fronk also testified that there was no meaningful discussion between him and CSB representatives concerning how the inventory and equipment was going to be sold. Additionally, Fronk testified that he could have provided CSB with assistance in the sale of the service center's assets and he had knowledge of other people, such as Marathon dealers, that CSB could have contacted regarding the sale of the assets.
 {¶ 21} Our review of the record reveals that CSB took possession of the inventory that consisted of perishable items (including perishable food, other shelf items from the Service Center, cigarettes, and oil) on their second visit to the Service Center and took the items to CSB's Lincoln Street office. Rashleigh testified that CSB engaged in this course of action and did not sell the items back to Marathon because she did not believe that Marathon was interested. Rashleigh testified that CSB finally sold the perishable items for $3,500 on February 3, 2005 and testified "at that point we had six month stale dated inventory." Additionally, Rashleigh testified that the inventory items sold for $3,500 also included gas *Page 11 
nozzles, reader board, the counter, shelving, three-door cooler, a safe, and a cash register. Rashleigh also testified that the car wash was eventually sold for $24,000 to a man named Doyle Barnett who had to remove the car wash himself. Finally, we note that Rashleigh testified that CSB sold the Service Center's automotive equipment for $1,500.
 {¶ 22} Based on the foregoing, we find that the record does not establish that CSB obtained competent and credible information regarding the value of the collateral and/or otherwise disposed of the collateral in conformity with reasonable commercial practices among dealers familiar with this type of collateral. Accordingly, we find that the trial court's determination that CSB's disposition of the collateral in the present case was done in a commercially reasonable manner so as to be in "conformity with reasonable commercial practices among dealers in the type of property" pursuant to R.C. 1309.627(B)(3), is not supported by the record. Therefore, Appellants' fourth assignment of error is sustained.
 Assignment of Error No. 3 {¶ 23} In their third assignment of error, Appellants allege that the trial court erred in ruling that because Appellants' inventory contained perishable items, CSB was not required to give notice concerning their sale and thus the court was not required to rule on the reasonableness of the sale. *Page 12 
 {¶ 24} R.C. 1309.611 addresses notification before disposition of collateral and provides, in relevant part, as follows:
 (B) Except as provided in division (D) of this section, a secured party who disposes of collateral under section 1309.610 of the Revised Code shall send a reasonable authenticated notification of disposition to the persons specified in division (C) of this section.
 (C) To comply with division (B) of this section, the secured party shall send an authenticated notification of disposition to: (1) The debtor; * * *
 (D) Division (B) of this section does not apply if the collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market. (Emphasis added).
 {¶ 25} The purpose of the notification requirement is to protect the debtor's interest in the collateral. By requiring the secured party to notify the debtor prior to disposition of the collateral, the debtor is given an opportunity to settle the account, or to take steps to assure a fair price is received for the property. Huntington Nat. Bank v.Recycling Center, Inc., (Dec. 10, 1985), 10th Dist. No. 84AP-1088, unreported, citing Peoples-Merchants Trust Co. v. Dosis (May 21, 1980), 5th Dist. No. CA-5139, unreported; see alsoAm. Seaway Foods, Inc. v. Belden S. Assoc. L.P. (1995),72 Ohio St.3d 514, 615 N.E.2d 941, reconsideration denied 73 Ohio St.3d 1454,654 N.E.2d 989.[4] *Page 13 
 {¶ 26} In the present case, the testimony presented at the May 17, 2006 evidentiary hearing reveals that Appellants never received notice of disposition of the Service Center's assets. Specifically, we note that Rashleigh testified that she never sent a written notice nor did she give verbal or other notice to Stephen Fronk of either when or how she was going to dispose of the collateral. Rashleigh also testified that she previously testified in her deposition that it was normally not CSB's policy get debtors involved in the sale of their collateral. Additionally, Rashleigh testified that Fronk "didn't volunteer it [to assist in the sale of the collateral] and I didn't consider calling him." We note that Stephen Fronk also testified that he made several unsuccessful attempts to contact Dan Kendrick at CSB regarding the status of CSB's disposition of the Service Center's assets.
 {¶ 27} Upon our review of the record, we agree with the trial court's finding that "[d]espite any inquiry on the part of defendants, plaintiff did not, nor attempt to, provide written or oral notice about the private sale of collateral. This lack of notification prevented Stephen Fronk from providing Plaintiff with names of potential buyers and/or to encourage other buyers to make offer [sic] on the collateral." (See July 10, 2006 Decision and Order, p. 6).
 {¶ 28} Based on the foregoing, we find that CSB did not comply with the notification provisions contained in R.C. 1309.611 as they did not properly notify *Page 14 
Appellants before CSB's disposition of Appellants' non-perishable collateral.[5] Accordingly, to this extent only, Appellants' third assignment of error is sustained.
 Assignment of Error No. 1 {¶ 29} In their first assignment of error, Appellants allege that the trial court erred in determining that R.C. Chapter 1309 does not explicitly deal with the repercussions of failing to provide notice of disposition to debtor. Specifically, Appellants allege that the trial court's reliance upon R.C. 1309.625(A) was misplaced and argue that the trial court should have examined CSB's actions pursuant to R.C. 1309.626.
 {¶ 30} R.C. Chapter 1309 governs secured transactions as well as sales of accounts and chattel paper.[6] R.C. 1309.625 specifically governs "remedies for secured party's failure to comply with article" and provides, in relevant part, as follows:
 (A) If it is established that a secured party is not proceeding in accordance with this chapter, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions.
 (B) Subject to divisions (C), (D), and (F) of this section, a person is liable for damages in the amount of any loss caused by *Page 15 a failure to comply with this chapter. Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing.
 {¶ 31} In contrast, R.C. 1309.626 governs actions in which deficiency or surplus is in issue and provides, in relevant part, as follows:
 In an action arising from a transaction in which the amount of a deficiency or surplus is in issue, the following rules apply:
 (A) A secured party is not required to prove compliance with sections 1309.601 to 1309.628 of the Revised Code relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance in issue.
 (B) If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with sections 1309.601 to 1309.628. . .
 (C) Except as provided in section 1309.628 . . . if a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with sections 1309.601 to 1309.628 . . . relating to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of:
 (1) The proceeds of the collection, enforcement, disposition, or acceptance; or
 (2) The amount of proceeds that would have been realized had the non-complying secured party proceeded in accordance with sections 1309.601 to 1309.628 . . . relating to collection, enforcement, disposition, or acceptance.
 (D) For purposes of division (C)(2) of this section, the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees *Page 16 unless the secured party proves that the amount is less than that sum.
 {¶ 32} In the present case, we note that the trial court relied entirely upon R.C. 1309.625(A) when determining the amount of the deficiency judgment to be received by CSB as a consequence of Appellants' default. In relying on this section, the trial court noted that "[s]ince this code section does not explicitly deal with the repercussions of failing to provide notice of disposition to a debtor, courts have split in their interpretation." However, the trial court noted that this court has previously allowed a deficiency judgment to stand, even in the absence of proper notice. See July 10, 2007 Decision and Order, p. 6, citing Estate of Gammell v. Modern Finance Co. (Sept. 3, 1998), 3rd Dist. No. 8-97-37, unreported. The trial court thus determined that "a lack of notice . . . gives rise to a rebuttable presumption against any deficiency judgment" and determined that "in order to overcome such a presumption, Commercial Savings must affirmatively prove . . . the debtor was given credit on his debt for the fair-market value of the collateral." The trial court then went on to state that CSB thus bears the burden of proving that fair value for collateral was received with respect to the car wash, mechanical automotive equipment and the cash register.
 {¶ 33} However, we note that the plain language of R.C. 1309.625(A) addresses remedies that can be obtained when a secured party is not proceeding in accordance with this chapter. Specifically, R.C. 1309.625(A) provides that the *Page 17 
"court may order or restrain collection, enforcement, or disposition of collateral." In our opinion, this statute governs actions presently or currently occurring, thus causing the party to seek the court's intervention prior to the collateral actually being collected, enforced, or disposed of by the secured party.
 {¶ 34} In contrast, the filing of CSB's complaint, as well as all of the court proceedings in the present case occurred after CSB had already taken possession of Appellants' collateral and subsequently sold the collateral. Therefore, we cannot see how the trial court could have relied upon R.C. 1309.625 in its analysis of the present case. Additionally, we note that the majority of the case law relied upon by the trial court in its July 10, 2007 Decision and Order, including this court's previous case of Gammell, predates the changes that occurred in Ohio's secured transaction and commercial paper law in 2001. (See 2001 S 74, effective 7-1-01).
 {¶ 35} Accordingly, we agree with the Appellants' allegation that the trial court erred in reviewing the actions of CSB pursuant to R.C. 1309.625 and should instead have reviewed and analyzed this matter pursuant to R.C. 1309.626. In applying R.C. 1309.626 to the facts of the present case, we note that subsection (B) provides that "[i]f the secured party's compliance is placed in issue, the secured party had the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with sections 1309.601 to *Page 18 
1309.628 . . ." Therefore, in applying R.C. 1309.626, we note that CSB had the burden of proof throughout the entire evidentiary hearing to prove that its disposition of Appellants' collateral was conducted in accordance with the relevant provisions of R.C. Chapter 1309. (See R.C. 1309.626(B)). Based upon our analysis of Appellants' third and fourth assignments of error, and specifically, our findings that CSB did not give Fronk proper notice as required under R.C. 1309.611 nor did CSB dispose of the collateral in a commercially reasonable manner pursuant to R.C. 1309.627, we find that CSB did not meet its burden of proving that the amount of proceeds which would have been realized had CSB acted in accordance with Chapter 1309 would still have been less than CSB's secured debt. Accordingly, Appellants' first assignment of error is sustained.
 Assignment of Error No. 2 {¶ 36} In their second assignment of error, Appellants allege that the trial court erred in admitting and relying on hearsay evidence to establish that CSB obtained fair market value in its disposition of the service center's carwash.
 {¶ 37} At the May 17, 2006 evidentiary hearing the trial court heard testimony from Rashleigh regarding the value of the carwash equipment. Rashleigh testified that she sold the car wash to Doyle Barnett for $24,000. Specifically regarding Appellant's allegations that the trial court erred in admitting hearsay evidence to establish that CSB obtained fair market value in its disposition *Page 19 
of the carwash, we note that the following exchange occurred on cross-examination:
 Attorney Beck: Now, with respect to the car wash equipment, how did you establish a value for that?
 Rashleigh: I had two detailed conversations with Mr. Beam from Peco who had actually installed that equipment and was familiar with the equipment. And he is also the one that advised me, he said I could advertise if I want but he said most of the folks that are in —
 Attorney Russo: Objection, hearsay.
 The Court: Sustained.
 Attorney Beck: Did he give you an appraised value?
 Rashleigh: Yes, he did. He told me after evaluating the equipment —
 Attorney Russo: Objection, same objection.
 The Court: I think we are going to get there eventually, I am going to overrule, let's get it in the Record.
 Attorney Beck: What was the value he placed on it?
 Rashleigh: $22,000 to $25,000 for salvage.
 {¶ 38} Additionally, our review of the record reveals that Stephen Fronk testified regarding his prior contact with Gary Beam. Fronk testified that he had previously dealt with Gary Beam and that Beam installed the car wash system at his service center. Fronk also testified and agreed that Beam was someone who would be reliable in terms of his experience about the valuation of the car wash. *Page 20 
However, we note that Fronk's asset schedule (admitted into evidence as Exhibit B) listed the value of the car wash at $65,000 and Fronk testified that the last time he saw the car wash it was in perfect working condition. Fronk's testimony about the working condition of the car wash contradicted the testimony presented by Rashleigh when she testified that, in examining the car wash equipment with Gary Beam, he pointed out and she noticed that the hydraulics and rollers were bound up and wouldn't move, that the bearings were bad and that the conveyor was bound up and needed to be rebuilt.
 {¶ 39} The Rules of Evidence forbid the use of hearsay evidence at trial absent a recognized exception. Evid. R. 802. Hearsay evidence is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). We note that decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. State v. Yohey (March 18, 1996), 3rd Dist. No. 9-95-46, unreported, citing State v. Graham (1979),58 Ohio St.2d 350, 390 N.E.2d 805 and State v. Lundy (1987), 41 Ohio App. 3d 163. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140. *Page 21 
 {¶ 40} It is this court's opinion that the testimony of Rashleigh concerning Gary Beam's assessment of the value of the car wash should have been introduced through the direct testimony of Gary Beam and subject to cross examination. In sum, the testimony presented by Rashleigh on this issue was clearly hearsay and did not fit within one of the recognized exceptions to the hearsay rule. See Evid. R. 803 and 804.
 {¶ 41} Furthermore, we note that in its July 10, 2007 Decision and Order, the trial court clearly relied on this hearsay testimony when the court determined as follows:
 As to the carwash, Commercial Savings testified that it contacted Gary Beam to assess the value of the carwash. Beam provided plaintiff with an appraisal between $20,000-$25,000. The carwash was subsequently sold to Doyle Barnett for $24,000.00, consistent with the appraised amount. * * * Furthermore, and perhaps most telling, at the evidentiary hearing, Stephen Fronk stated that he considered Beam to be an expert in the carwash field. Accordingly, the Court finds that plaintiff has met its burden of proof, establishing that the carwash was sold for fair-market value.
 {¶ 42} Based on the foregoing, we agree with Appellants' allegation that the hearsay testimony presented by Rashleigh as to what Gary Beam told her regarding the value of the car wash and whether or not its sale for $24,000 was reasonable rises to the level of prejudicial error. Accordingly, we find that the trial court erred in admitting this hearsay testimony and relying on same. Therefore, Appellant's second assignment of error is sustained. *Page 22 
 Assignment of Error No. 5 {¶ 43} In their fifth assignment of error, Appellants allege that the trial court's Decision and Judgment Entry are contrary to law and unsupported by and against the manifest weight of the evidence.
 {¶ 44} Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.C.E. Morris Co. v. Foley Const. Co. (1978), 54 Ohio St.2d 279, 280,376 N.E.2d 578. "In determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the findings of facts." Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 80, 461 N.E.2d 1273. The underlying rationale of giving deference of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. Id. at 80. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of *Page 23 
witnesses and evidence is not." State v. Wilson (2007),113 Ohio St.3d 382, 387, 865 N.E.2d 1264 citing Seasons Coal, 10 Ohio St.3d at 81.
 {¶ 45} Based upon our disposition of Appellants' first four assignments of error, we find that the trial court's Decision and Judgment are unsupported by and are against the manifest weight of the evidence. Accordingly, Appellants' fifth assignment of error is sustained.
 {¶ 46} Based on the foregoing, the August 8, 2007 Judgment Entry and the July 10, 2007 Decision and Order of the Court of Common Pleas of Hancock County, Ohio are reversed and this matter is remanded to the trial court for further proceedings consistent with this opinion.
Judgment Reversed and Cause Remanded.
 WILLAMOWSKI and ROGERS, J.J., concur.
[1] The real estate mortgage held by CSB is subordinate to mortgages held by First National Bank of Pandora and Sky Bank. All three real estate mortgages encumbered the property owned by Stephen and Tammie Fronk located at 1324 South West Street in Findlay. However, we note that First National Bank of Pandora and Sky Bank are not parties to the present appeal.
[2] We note that R.C. 1309.627 contains provisions analogous to former R.C. 1309.50(B), repealed by 2001 S 74, eff. 7-1-01.
[3] Watson testified that "cost" meant the amount that Stephen Fronk paid for the items from his wholesale supplier.
[4] We note that these cases addressed the notification provisions as contained in former R.C. 1309.47(C). Former R.C. 1309.47(C) related to a secured party's disposition of collateral. See now R.C. 1309.610(B) and (C), R.C. 1309.611 and R.C. 1309.624 for provisions analogous to former R.C. 1309.47(C) as repealed by 2001 S 74, eff. 7-1-01.
[5] We note that, pursuant to R.C. 1309.611(D) CSB was not required to provide notice to Fronk regarding the disposition of the perishable collateral. However, as to the perishable collateral, CSB still had a duty to dispose of it in a commercially reasonable manner. Because CSB did not dispose of the perishable collateral immediately and instead waited six months to dispose of said collateral, CSB did not act in a commercially reasonable manner regarding the disposition of the perishable collateral. (See Appellants' Assignment of Error No. 4, supra).
[6] We note that R.C. 1309.01 through 1309.50 were repealed by 2001 S 74, effective July 1, 2001 and recodified as R.C. 1309.101 through1309.709. *Page 1